UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

FLEXPORT, INC.,

    Plaintiff,

v.

WESTERN GLOBAL AIRLINES, LLC,

    Defendant.

_____/

Index No. 19-6383

**<u>AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES</u>**

COMES NOW, Plaintiff, Flexport, Inc., by and through the undersigned counsel, and files this, its Amended Complaint for Declaratory Relief and Damages and in support thereof would state:

**PARTIES, JURISDICTION AND VENUE**

1. At all material times, Plaintiff, Flexport, Inc. (hereinafter "Flexport") was and is a Delaware corporation, with its principal place of business in San Francisco, California.

2. At all material times Defendant, Western Global Airlines, Inc. (hereinafter "WGA") was and is a Florida limited liability company, with its principal place of business in Lee County, Florida.

3. This Court has personal jurisdiction over Flexport and WGA, and venue is proper in this District based upon the forum selection clause in the Parties' Agreement which provides: "The United States District Courts for the Southern District of New York (and the appeals courts originating therefrom) have <u>exclusive</u> jurisdiction to resolve any dispute arising from or related to this Agreement."

1

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201, as this matter is between two diverse parties and seeks determination of a judgment for the purpose of determining a question of actual controversy between the parties.

5. The resolution of the controversy at issue exceeds the minimum threshold to sustain diversity jurisdiction.

## FACTUAL BACKGROUND

6. Flexport is a logistics service provider that helps companies plan and arrange the transportation of freight on behalf of its customers.

7. WGA is an airline which provides aircraft for the transportation of cargo.

8. In or about January 2018, Flexport and WGA entered into an agreement entitled "Aircraft Services Agreement No. LX 04/1/2018" (hereinafter the "Agreement"), by which WGA agreed to charter a 747-400 BCF aircraft to Flexport, for designated rotations between Hong Kong and Los Angeles between April 1, 2018 through March 31, 2021.

9. From the outset, it is undisputed that the 747-400 suffered from numerous mechanical and other service failures.

10. The service failures of the 747-400 were the result of the failure by WGA to properly maintain and/or operate the aircraft.

11. In fact, shortly after the effective date of the Agreement, it is further undisputed that the 747-400 became inoperative and was sent for repairs.

12. The parties do not dispute that these repairs lasted for more than three (3) months.

13. As an "accommodation", WGA offered to replace the 747-400 with an older, smaller, MD-11 aircraft.

14. The MD-11 was far inferior to the 747-400 which Flexport contracted to utilize and not fit for the commercial purposes which Flexport needed for its business.

15. Moreover, the MD-11 presented significant difficulties with respect to the loading and unloading of cargo including, but not limited to, the size of the aircraft and loading bays.

16. With a smaller capacity, the MD-11 was inadequate for the needs of Flexport with respect to the payload capacities and aircraft capabilities for which the Agreement was entered into.

17. Unfortunately, Flexport – faced with the demands from its customers – had no choice but, without prejudice, to accept the use of this inferior aircraft, with the express understanding that the 747-400 would soon be operational.

18. In good faith, Flexport tried to work with WGA.

19. However, the MD-11 too suffered a seemingly endless series of mechanical failures and delays, while the 747-400 sat idle for months awaiting parts to be repaired.

20. As the service failures by WGA mounted, Flexport's business suffered.

21. As a logistics services provider, Flexport makes arrangements for the transportation of cargo. Flexport's customers request transportation by air in order to ensure that their products, which may be time-sensitive and/or perishable, are transported readily and efficiently.

22. Flexport operates in a highly-competitive industry. Ongoing service failures and delays by WGA would subject Flexport to termination by its customers and a multitude of claims, expenses and costs.

23. As a result of the myriad service failures, Flexport's business was severely disrupted and it suffered damages.

24. In the course of its service failures, WGA continued to make multiple promises of improvements and increased reliability in the performance of its duties.

25. Flexport relied upon these promises in good faith in continuing the business relationship.

26. Ultimately, however, WGA's performance failures grew too much to ignore and Flexport had no choice but to terminate the contract or risk further, immeasurable lost business.

27. The Agreement provides, in pertinent part:

> L.   Term and Termination
>
> 2.   Should [WGA] fail to provide the agreed operational performance, [Flexport] may terminate the Agreement without any indemnities or penalties owed to [WGA] with immediate effect sixty (60) days after written notice is issued. Failure to meet operational performance is defined as: [WGA]'s schedule reliability rate dropping below 80 percent during any two-month rolling period.

28. The schedule reliability rate is defined as the number of carrier-controlled arrival delays over 90 minutes divided by the number of live flights.

29. On or about April 30, 2019, WGA provided Flexport with the On Time Performance Reports for each month in 2019 (see attached Exhibit "A").

30. The Reports designated the delays which were attributable to WGA, and those which WGA deemed to be non-attributable.

31. For the month of March 2019, WGA identified that its on-time performance ("OTP") attributable to WGA was 66.10%.

32. For the month of April 2019, WGA identified that the OTP attributable to WGA was 80.39%.

33. As such, based upon the express representations of WGA, its OTP over the two-month period beginning March 1, 2019 was well below the 80% threshold.

34. On this basis, as well as numerous other service failures, on May 5, 2019, Flexport advised WGA that it was terminating the Agreement, with the requisite 60-day notice.

35. WGA argues, without support or explanation, that Flexport may not rely upon WGA's own report as support for WGA having fallen below the 80% trigger threshold.

36. Flexport inquired of WGA as to how the data was inaccurate.

37. To date, however, no such details have been provided and the OTP Reports have never been withdrawn, modified or amended.

38. Further, on June 17, 2019, Flexport and WGA had a discussion during which WGA confirmed that it would not be providing any flights for Flexport after July 6, 2019 due to the termination of the Agreement.

39. However, after June 17, 2019, WGA continued to issue flight schedules which included flights to take place after July 6, 2019.

40. On June 21, 2019, Flexport followed up with WGA to advise that it was still receiving such flight schedules even though the contract had been properly terminated.

41. In response, on the following day WGA provided Flexport with the flight schedule for July, which correctly confirmed that no flights had been scheduled after the July 6, 2019 rotation. Notably, no flights were designated as being cancelled.

42. All conditions precedent have been met or waived.

## COUNT I
## DECLARATORY RELIEF

43. Plaintiff hereby repeats and realleges paragraphs 1-42 as if fully set forth herein.

44. This is a claim for declaratory judgment pursuant to 28 U.S.C. §2201 for the purpose of determining questions of actual controversy between the parties.

45. The OTP Reports are documents generated by WGA in the ordinary course of its business, which reflect its performance metrics for the months of March and April 2019.

46. These OTP Reports were created by WGA and provided by WGA to Flexport.

47. WGA knew, or should have known, that Flexport would rely upon the representations in the OTP Reports in determining WGA's performance of its services.

48. Flexport did, in fact, rely upon these WGA-created reports in making its decision to terminate the Agreement.

49. Nevertheless, WGA denies that Flexport may utilize the OTP Reports generated by WGA for the position that WGA failed to meet its performance metrics.

50. WGA further denies, despite the OTP Reports it generated and provided to Flexport, that its OTP for the two-month period of March and April 2019 was less than 80%.

51. Further, after WGA confirmed that no flights would be scheduled after July 6, 2019, it reissued the flight schedule to reflect that no such flights have been scheduled.

52. Thereafter, however, WGA issued invoices to Flexport for the flights which had been removed from the schedule by WGA. The invoices made reference to "termination fees". WGA incorrectly assumes that these fees would be applicable if the Agreement was terminated by Flexport in the event the OTP for March and April 2019 was <u>not</u> less than 80%.

53. Actual controversies therefore exist between the parties with regard to: (1) whether Flexport's termination was proper since WGA's OTP was below 80 % for the subject time period; (2) the determination as to whether Flexport was entitled to rely upon the OTP Reports generated by WGA; and (3) whether WGA is estopped from denying the accuracy of the Reports triggering Flexport's termination of the Agreement.

WHEREFORE, based upon the foregoing, Flexport would respectfully request that this Honorable Court enter a declaratory decree holding:

1. That Flexport properly terminated the Agreement based upon WGA's OTP for the subject time period;
2. That Flexport was entitled to rely upon the OTP Reports produced by WGA in terminating the Agreement;
3. That WGA is estopped from denying that Flexport could rely upon the OTP Reports in terminating the Agreement;
4. For an award of attorney's fees incurred in bringing and prosecuting this action;
5. And for such other and further relief as this Court deems just and proper.

## COUNT II
## DEFAMATION

54. Plaintiff hereby repeats and realleges paragraphs 1-42 as if fully set forth herein.

55. This Court has original jurisdiction over this claim as it is between citizens of different States and Plaintiff damages exceed the minimum amount in controversy.

56. Alternatively, Plaintiff would ask the Court to exercise is supplemental jurisdiction over the instant State law claim pursuant to 28 U.S.C. § 1367.

57. On July 10, 2019, Plaintiff filed the Complaint in this matter seeking a declaration of its rights as more fully set forth therein.

58. On July 26, 2019, an article appeared in the LoadStar, an online publication at the following address: https://theloadstar.com/wga-hits-back-flexport-dumped-our-contract-after-receiving-a-better-offer/

59. In this article, WGA, through its corporate officer[1], James Neff, made false statements regarding Flexport.

60. Specifically, Mr. Neff was quoted in the article as saying:

> **"It is truly disappointing that Flexport would resort to such blatant and false misrepresentations. The only party at fault and in breach is Flexport."**
>
> **"What Flexport did was not only illegal, in breaching our contract, but also unethical, in attempting to discredit WGA by filing this meritless suit full of false allegations against WGA."**
>
> **"Flexport's false and meritless bad faith complaint was immediately followed by its announcement of the seamless switch to Atlas, so it is obvious that Flexport terminated its agreement with WGA in breach of its contractual obligations, pure and simple, because after a year into the three-year contract with WGA, as market conditions changed, Flexport got a better offer from WGA's competitor."**
>
> **"…Flexport filed a defamatory, meritless, self-serving and factually incorrect public document in Federal Court, just because WGA adhered to the billing provisions of its agreement with Flexport, subject to pending mediation and arbitration."**

61. These statements are utterly false, and were either known by WGA and Mr. Neff, or should have been known with even a minimum exercise of due care, to be false when made.

62. WGA intentionally or recklessly made these statements to the LoadStar without the authorization or permission of Flexport, and with the express understanding and intention that same be published to the public at large.

63. The defamatory statements caused and will continue to cause damages to Flexport's business and reputation.

---

[1] It is noted that, as set forth in its publicly-filed corporate documents with the Florida Secretary of State, the only manager of WGA is Neff Air, LLC. The address of Neff Air LLC as designated in such documents is a residence located on Fisher Island in Miami-Dade county, Florida. However, Neff Air LLC is not registered to do business in Florida.

64. Further, the statements alleging illegal and unethical conduct on behalf of Flexport constitute defamation *per se*.

65. Indeed, the very first sentence of the article provided that WGA accuses Flexport of acting "unethically" and "illegally".

66. Flexport has requested that WGA retract the statements. However, WGA outright refused.

WHEREFORE, Flexport would ask for judgment to be rendered against WGA for actual and special damages, and for such other and further relief as this Court deems just and proper.

Date: August 27, 2019                                Respectfully Submitted,

**SPECTOR RUBIN, PA**

By:   */s/ Andrew Spector*
      Andrew R. Spector, Esq. (NY 3887)
      Continental Plaza
      3250 Mary Street, Suite 405
      Miami, Florida 33133

      43 West 43rd Street, Suite 147
      New York, NY 10036
      Tel: (305) 537-2000
      Fax: (305) 537-2001

      *Attorneys for Plaintiff*