UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FLEXPORT, INC., <br><br> Plaintiff. <br><br> -v.- <br><br> WESTERN GLOBAL AIRLINES, <br><br> Defendant. | **ORDER** <br><br> 19 Civ. 6383 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

    Plaintiff Flexport, Inc. has sued Defendant Western Global Airlines, LLC ("WGA"), seeking a declaratory judgment that Flexport is entitled to terminate the parties' Aircraft Services Agreement, and asserting a claim for defamation. (Am. Cmplt. (Dkt. No. 12) ¶¶ 43-66) WGA has moved to compel arbitration of Flexport's claims pursuant to the Federal Arbitration Act ("FAA"), and to stay the instant action pending resolution of the arbitration proceedings. (See Def. Mot. (Dkt. No. 25); Def. Br. (Dkt. No. 26))

    For the reasons stated below, Defendant's motion to compel will be denied.

## BACKGROUND

**I. FACTS**

  **A. Aircraft Services Agreement**

    Plaintiff Flexport provides logistics services in connection with freight transportation. (Am. Cmplt. (Dkt. No. 12) ¶ 6) Its customers "request transportation by air in order to ensure that their products, which may be time-sensitive and/or perishable, are transported readily and efficiently." (Id. ¶ 21) In January 2018, Flexport entered into an Aircraft Services Agreement with Defendant WGA, a global freight forwarder, for use of a 747-400 BCF

aircraft to transport cargo between Hong Kong and Los Angeles on a weekly basis between April 1, 2018 and March 31, 2021 (the "Agreement").  (Id. ¶¶ 7-8)

Soon after April 1, 2018, the 747-400 aircraft WGA provided suffered mechanical and other service failures.  (Id. ¶ 9)  The aircraft was inoperable for more than three months while undergoing repairs.  (Id. ¶¶ 11-12)  As a replacement for the 747-400 aircraft, WGA provided Flexport with an MD-11 aircraft.  (Id. ¶ 13)  The MD-11 aircraft is "older [and] smaller" than the 747-400 and is not suitable for transporting the large items that Flexport arranges to ship for its customers.  (Id. ¶¶ 13-16)  In the face of pressing customer demands, however, Flexport attempted to make use of the MD-11 aircraft as a substitute, but the MD-11 also suffered from "a seemingly endless series of mechanical failures and delays."  (Id. ¶¶ 17-19)  Flexport's business suffered as a result.  (Id. ¶¶ 20-23)

### B. Flexport Terminates the Agreement

Although WGA promised improved performance, in April 2019, Flexport sought to terminate the Agreement.  (Id.  ¶¶ 24-29)  Flexport invoked Section L.2 of the Agreement, which provides that – in the event that WGA should "fail to provide the agreed operational performance" – Flexport "may terminate the Agreement without any indemnities or penalties owed to [WGA] with immediate effect sixty (60) days after written notice is issued."  (Id. ¶ 27)  Under the Agreement, a "failure to meet operational performance" occurs when WGA's "schedule reliability rate drop[s] below 80 percent during any two-month rolling period."  (Id.)  According to Flexport, WGA's on-time performance dropped below the 80% threshold in March and April 2019.  (Id. ¶¶ 29-33)

On May 5, 2019, Flexport sent WGA its Notice of Termination, thereby providing 60 days' notice that it was terminating the Agreement due to WGA's failure to meet operational

performance requirements "as well as numerous other service failures."[1]  (Id. ¶ 34; Def. Br. (Dkt. No. 26) at 11)  Following Flexport's notice that it was terminating the Agreement, WGA informed Flexport that it would not provide any flights after July 6, 2019.  (Id. ¶¶ 38-41)

## II.     PROCEDURAL HISTORY

Flexport filed this action on July 10, 2019, seeking, inter alia, a declaratory judgment that it properly terminated the Agreement.  (See Cmplt. (Dkt. No. 1) ¶¶ 44-53)

Flexport filed the Amended Complaint on August 27, 2019.  (Am. Cmplt. (Dkt. No. 12))  The Amended Complaint adds a defamation claim that is premised on statements made by a WGA representative in a July 26, 2019 online article.  (Id. ¶¶ 54-66)  The article quotes the WGA representative as stating, inter alia, that Flexport had acted illegally and unethically in breaching the Agreement, and had filed a "meritless suit full of false allegations against WGA."  (Id. ¶ 60)

WGA moved to compel arbitration on January 10, 2020.  (See Def. Mot. (Dkt. No. 25); Def. Br. (Dkt. No. 26))[2]

---

[1] WGA states that Flexport terminated the agreement on May 7, 2019.  (See Def. Br. (Dkt. No. 26) at 9, 11)  The parties' briefs do not explain the basis for this discrepancy.  WGA states only that "whether the notice was sent on May 5 or May 7, the 30-day negotiation period expired in early June 2019."  (Id. at 11 n.9)

[2] On August 7, 2019, WGA initiated an arbitration proceeding before the American Arbitration Association ("AAA").  (Def. Br. (Dkt. 26) at 3)  On August 22, 2019, the parties participated in an initial administrative conference before the AAA, after which an arbitrator was selected.  (Id.)  The Arbitrator conducted a preliminary conference on October 25, 2019, and issued an order directing the parties to mediate the dispute prior to December 20, 2019.  (Id. (citing Procedural Order No. 1); Wissner-Gross Aff. (Dkt. No. 28) ¶ 8))  On January 17, 2020, the Arbitrator stayed the arbitration proceeding pending resolution of the instant motion to compel arbitration.  (See Pltf. Sur-Reply (Dkt. No. 37) at 1-2 (citing Procedural Order No. 2))

**DISCUSSION**

I. **LEGAL STANDARDS**

Under the Federal Arbitration Act (the "FAA"), an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement." 9 U.S.C. § 4. The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Hartford Accident & Indem. Co. v. Swiss Reinsur. Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).

Given the federal policy favoring arbitration, "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration." Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210, 215 (2d Cir. 2014) (quoting Applied Energetics, Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011). However, this "presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made." (Id. (quoting Applied Energetics, 645 F.3d at 526))

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion." Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). "As on a motion for summary judgment, the parties may submit documents in support or opposition of their motion, and the court 'consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party.'" Cornelius v. Wells Fargo Bank, N.A., No. 19-CV-11043 (LJL), 2020 WL

1809324, at *4 (S.D.N.Y. Apr. 8, 2020) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).

"If the party seeking arbitration demonstrates its entitlement to arbitration by a showing of evidentiary facts, the burden then shifts to the opposing party to submit evidentiary facts demonstrating there is a dispute of fact showing that the agreement is inapplicable or invalid." Id.  A party resisting arbitration "may not satisfy this burden through 'general denials of the facts on which the right to arbitration depends'; in other words, '[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.'" Dill v. JPMorgan Chase Bank, N.A., 19 CIV. 10947 (KPF), 2020 WL 4345755, at *4 (S.D.N.Y. July 29, 2020) (quoting Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995)).

"If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4).  Where, however, "the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, 661 F.3d 164, 172 (2d Cir. 2011)).

In deciding whether a particular dispute is subject to arbitration, courts consider: "(1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the

balance of the proceedings pending arbitration." Begonja v. Vornado Realty Tr., 159 F. Supp. 3d 402, 408-09 (S.D.N.Y. 2016) (citing Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008)).

## II.     THE AGREEMENT'S DISPUTE RESOLUTION PROVISIONS

The Agreement includes the following dispute resolution provisions, which are set forth in a section entitled "Governing Law and Forum Selection":

1. This Agreement and all disputes between and among the Parties relating to or arising out of this Agreement shall be construed according to the law of the State of New York without regard to conflicts of law principles.  The United States District Courts for the Southern District of New York (and the appeals courts originating therefrom) have exclusive jurisdiction to resolve any dispute arising from or related to this Agreement.  The prevailing party in any dispute to enforce this Agreement, including any appeals, shall be entitled to receive all costs and reasonable attorneys' fees.

2. If a dispute between the Parties arises under this Agreement, the Parties shall negotiate in good faith in an attempt to resolve such dispute.  The obligation of the Parties to negotiate in good faith shall commence immediately at the time any dispute arises between the Parties and shall continue for a period of at least thirty (30) days ("Negotiation").

3. If Negotiation fails to resolve a dispute between the Parties concerning the enforcement of this Agreement within thirty (30) days from the first time either Party invokes this dispute resolution clause, then either Party may proceed to demand a mediation ("Mediation").  However, upon agreement of both Parties, Arbitration may be initiated immediately, in lieu of Mediation.

4. If a dispute between the Parties arises under this Agreement and has not been resolved under the Negotiation procedures described herein, either Party may require, by written notice to the other Party, that Negotiation be facilitated by a single Mediator, to be selected by the Parties (the "Mediator").

5. The Parties shall select the Mediator within ten (10) days after receipt of notice.  If the Parties are unable to agree on the Mediator, the Mediator shall be appointed by the American Arbitration Association (hereinafter "AAA") in accordance with the Commercial Mediation Procedures of the AAA in effect at the date of the Arbitration[] and, in any case, the selected Mediator shall be independent of Carrier and its affiliates and the Charterer and its affiliates.  The fees of the Mediator shall be divided equally between the Parties irrespective of the outcome of the Mediation.

6. With the assistance of the Mediator, the Parties shall continue Negotiation in good faith for a period not to exceed thirty (30) days.  If the Parties are unable to reach

agreement during this period, the Mediator shall be discharged and the Parties' obligations to Negotiate and Mediate shall be deemed satisfied.

7. Subject to the duty to Negotiate and Mediate set forth above, all disputes, claims, or causes of action arising out of or relating to this Agreement or the validity, interpretation, breach, violation, or termination thereof not resolved by Mediation, shall be finally and solely determined and settled by Arbitration to be conducted in the State of New York, USA, in accordance with the Commercial Arbitration Rules of the AAA in effect at the date of Arbitration.

8. Any Arbitration commenced pursuant to this Agreement shall be conducted by a single neutral Arbitrator who shall have a minimum of three (3) years of commercial experience (the "Arbitrator").  The Parties shall meet within ten (10) days of failure to resolve by Mediation to attempt to agree on a neutral Arbitrator.  If the Parties do not agree on a neutral Arbitrator, then a neutral Arbitrator shall be appointed by the AAA in accordance with the Commercial Arbitration Rules of the AAA in effect at the date of the Arbitration.  In any case, the selected Arbitrator shall be independent of Carrier and its affiliates and Charterer and its affiliates.

9. If the terms and conditions of this Agreement are inconsistent with the Commercial Arbitration Rules of the AAA, the terms and conditions of this Agreement shall control.

10. The Parties hereby consent to any process, notice, or other application to said courts and any document in connection with Arbitration may be served by (i) certified mail, return receipt requested; (ii) by personal service; or (iii) in such other manner as may be permissible under the rules of the applicable court or Arbitration tribunal; provided, however, that notice of at least 30 days is provided before any appearance is required.

11. The prevailing Party in any Arbitration to enforce this Agreement shall be reimbursed for all reasonable costs and expenses incurred in such proceeding and related legal proceedings, including reasonable attorneys' and experts' fees.  In all other disputes Arbitrated pursuant to this section, each Party shall be responsible for its own costs and expenses and the fees of the Arbitrator shall be divided equally between the Parties irrespective of the outcome of the Arbitration.

12. The Judgment of the Arbitrator shall be final and either Party may submit such decision to courts for enforcement thereof.

13. The dispute resolution provisions of this Section shall survive termination or expiration of this Agreement.

(Id. §§ O.1-O.13)

### III. WHETHER THE AGREEMENT UNAMBIGUOUSLY PROVIDES THAT DISPUTES UNDER THE AGREEMENT ARE TO BE RESOLVED THROUGH ARBITRATION

""'"Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."'" Bensadoun, 316 F.3d at 175 (quoting John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 53 (2d Cir. 2001) (quoting AT&T Techs. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986))). Because the Agreement does not "clearly and unmistakably provide" that this question is to be decided by an arbitrator, it must be resolved by this Court.  See Spear, Leeds & Kellogg v. Cent. Life Assurance Co., 85 F.3d 21, 25 (2d Cir. 1996) ("Whether or not a matter is arbitrable is a matter for judicial determination.") (citing AT&T Techs. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)).

As discussed above, where the agreement at issue unambiguously provides for arbitration, a court may resolve the issue as a matter of law.  Meyer, 868 F.3d at 74.  Conversely, where "there is an issue of fact as to the making of the agreement for arbitration," resolution as a matter of law is not appropriate.  Bensadoun, 316 F.3d at 175.

Here, the Agreement is ambiguous as to whether the parties agreed to submit disputes arising under the Agreement to arbitration.

As an initial matter, there is compelling evidence that it was the intent of the parties to submit disputes arising under the Agreement to arbitration.  The Agreement provides that

> all disputes, claims, or causes of action arising out of or relating to this Agreement or the validity, interpretation, breach, violation or termination thereof not resolved by Mediation, shall be finally and solely determined and settled by Arbitration to be

8

conducted in the State of New York, USA, in accordance with the Commercial Arbitration Rules of the AAA in effect at the date of Arbitration.

(Agreement (Dkt. No. 27-1) § O.7)  The Agreement also addresses (1) how the arbitrator will be selected; (2) how notices and documents related to any arbitration will be served; (3) liability for costs and expenses associated with an arbitration; and (4) the finality of the arbitrator's decision, and how the arbitrator's decision may be enforced.  (Id. §§ O.8, O.10-O.12)

In addition to these provisions addressing arbitration, however, the Agreement provides that "[t]he United States District Courts for the Southern District of New York (and the appeals courts originating therefrom) have exclusive jurisdiction to resolve any dispute arising from or related to this Agreement."  (Id. § O.1)  The reference to "exclusive jurisdiction to resolve any dispute arising from or related to this Agreement" creates an ambiguity, because it suggests an intent that disputes arising under the Agreement be addressed exclusively by a judge in this District.

To summarize, the court and arbitration provisions (id. §§ O.1, O.7) refer to "any dispute" and "all disputes," respectively, and are thus "all-inclusive." Applied Energetics, 645 F.3d at 525.  These provisions are also "mandatory":  the court provision refers to "exclusive jurisdiction," while the arbitration provision states that "all disputes . . . shall be finally and solely determined and settled by Arbitration.  (Id.; see also Agreement (Dkt. No. 27-1) §§ O.1, O.7)  And because the two provisions provide for exclusive jurisdiction in different fora (Agreement (Dkt. No. 27-1) §§ O.1, O.7), "neither admits the possibility of the other." Applied Energetics, 645 F.3d at 525.

Given these circumstances, this Court cannot – on the basis of the language employed in the Agreement – resolve as a matter of law the issue of whether the parties agreed to refer disputes arising under the Agreement to arbitration.

As discussed above, where an agreement is ambiguous as to the issue of an agreement to arbitrate, a court is permitted to consider parol evidence. See Cornelius, 2020 WL 1809324, at *4. Here, the parol evidence submitted by the parties is contradictory and does not provide a basis for resolving the issue as a matter of law.

Plaintiff has submitted a declaration from Neel Jones Shah, Executive Vice President and Global Head of Airfreight at Flexport. Shah describes the parties' negotiations concerning the Agreement's dispute resolution provisions. Shah acknowledges that "WGA expressed a preference to handle disputes via arbitration," but asserts that it "[u]ltimately . . . agreed that the District Court for the Southern District of New York would have jurisdiction to hear all disputes between the parties relating in any way to the Agreement." (Shah Decl. (Dkt. No. 33-1) ¶¶ 6-21) (emphasis in original) Shah further contends that, "[a]s a compromise, the parties agreed to arbitration being available in limited circumstances, and then only after negotiation and mediation." (Id. ¶ 18) As examples of the "limited circumstances" in which arbitration is available under the Agreement, Shah cited the following scenarios: (1) "WGA failed to provide services under the Agreement [such as] ground handling, catering, the provision of pallets, etc., and Flexport wanted to enforce the term of the Agreement"; and (2) "WGA provided services and Flexport failed to pay for them. . . . [In such circumstances,] WGA could utilize the limited arbitration provision to enforce the payment terms." (Id.)

By contrast, WGA contends that Section O.1 – which refers to "exclusive jurisdiction" in the Southern District of New York – constitutes a scrivener's error, and that it was always the intent of the parties that disputes arising under the Agreement be resolved in arbitration. (Def. Br. (Dkt. No. 26) at 12-17, 20-21) In support of this argument, WGA submits an affidavit from James K. Neff, its chief executive officer. (Neff Aff. (Dkt. No. 31)) Neff

10

disputes Shah's contention that the parties intended that arbitration would be available only in limited circumstances. Indeed, Neff contends that "there was never any discussion of limiting arbitration to the narrow set of circumstances suggested by Mr. Shah, and the plain language in Section O.7 contradicts the claims of Mr. Shah to the contrary." (Id. ¶ 7). According to Neff, "[w]hile Flexport did initially propose that disputes be litigated in court, I was opposed to that and was adamant, as noted above, that all disputes arising out of relating to the Agreement . . . would only be resolved in AAA commercial arbitration, and Flexport agreed to my request, as reflected in Section O.7 of the Agreement." (Id. ¶ 8)

In sum, the Agreement is ambiguous as to whether there was an agreement to refer disputes arising under the Agreement to arbitration, and this issue cannot be resolved as a matter of law based on the parol evidence submitted by the parties.[3]

---

[3] WGA points out that the Agreement incorporates the Commercial Arbitration Rules of the AAA, which provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." (Def. Br. (Dkt. No. 26) at 15-16 (quoting AAA R. 7(a)); see also id. citing Contec Corp. v. Remote Sol., Co., 398 F.3d 205, 208 (2d Cir. 2005) (where parties "explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator")).

This argument is of no assistance to WGA, however, because the conflict between the Agreement's court and arbitration provisions creates a question as to whether the parties formed a valid agreement to arbitrate. Where, as here, an ambiguity touches on "contract formation, such that a court must decide the issue in order to ensure that the parties actually consented to arbitrate at all[,]" the "parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place," since "[a]rbitration is, first and foremost, 'strictly a matter of consent.'" Doctor's Assocs., Inc. v. Alemayehu, 934 F.3d 245, 251 (2d Cir. 2019) (quoting Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 298 n.6 (2010)) (emphasis in original). Accordingly, where a party contests "the formation of the parties' arbitration agreement" or "its enforceability or applicability to the dispute in issue, . . . 'the court' must resolve the disagreement." Granite Rock Co., 561 U.S. at 299-300 (citation omitted); see also Doctor's Assocs., 934 F.3d at 251 (a court must "first look to see if an agreement to arbitrate was formed, then determine if it contains a delegation clause. . . . Arguments that an agreement to arbitrate was never formed . . . are to be heard by the court even

**CONCLUSION**

        For the reasons stated above, Defendant's motion to compel arbitration is denied.

The Clerk of Court is directed to terminate the motion (Dkt. No. 25).

Dated:  New York, New York
         November 30, 2020

                                                      SO ORDERED.

                                                      Paul G. Gardephe
                                                      United States District Judge

---

where a delegation clause exists.") (quoting Edwards v. Doordash, Inc., 888 F.3d 738, 744 (5th Cir. 2018))